UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SCOTT VAN VALIN, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 09-961 (RMC) |
| GARY LOCKE, Secretary, Department of Commerce, *et al.*, | ) ) ) ) | |
| Defendants. | ) ) ) | |

MEMORANDUM OPINION

Scott Van Valin, Ken Dole, Rick Bierman, Theresa Weiser, Donald Westlund, and Richard Yamada are charter fishing operators in area 2C (Southeast Alaska). They brought this suit against the following Defendants: Gary Locke, in his official capacity as Secretary of the Department of Commerce; Dr. Jane Lubchenco, in her official capacity as Administrator of the National Oceanic and Atmospheric Administration; and Dr. James Balsinger, in his official capacity as Acting Administrator of the National Marine Fisheries Service ("NMFS").[1] Plaintiffs challenge a Final Rule adopted by the Secretary of Commerce on May 6, 2009, effective June 5, 2009. *See* 74 Fed. Reg. 21194. The only provision of the Final Rule that Plaintiffs challenge is the limitation on the harvest of Pacific halibut to one halibut per calendar day by guided charter vessel anglers in Area 2C (Southeast Alaska).

---

[1] NMFS is a division of the National Oceanic and Atmospheric Administration, an agency within the Department of Commerce. For ease of reference Defendants are collectively referred to as "the Secretary."

## I. FACTS

### A. Prior Litigation

This is the Secretary's second attempt to limit charter fishermen to a one-fish daily bag limit in Area 2C. A substantially similar group of plaintiffs challenged a rule that imposed a one-halibut-per-day limit in 2008. *See Van Valin v. Gutierrez*, No. 08-941 (D.D.C.) (challenging 73 Fed. Reg. 30504, May 28, 2008 final rule). In that case, the Court granted the plaintiffs' request for a temporary restraining order and then granted a preliminary injunction on June 20, 2008, enjoining the enforcement of the 2008 rule. The Court found that plaintiffs made a clear showing of irreparable harm because they had received cancellations of charter bookings for the 2008 season due to the one fish limit, causing them great monetary loss and threatening the very existence of their businesses. *See Bracco Diagnostics v. Shalala*, 963 F. Supp. 20, 29 (D.D.C. 1997) (economic injury may amount to irreparable harm if no adequate compensatory relief is available). The Court also found that plaintiffs had made a clear showing of likelihood of success on the merits on their claim that the Secretary violated his own regulations in violation of the Administrative Procedure Act, 5 U.S.C. § 551 *et seq*. The 2008 rule was based on the 2003 guideline harvest level regulations, and yet it limited the halibut harvest by the charter sector in anticipation of the projected 2008 harvest — instead of regulating to a past guideline harvest level as contemplated by the 2003 regulation. After the Court granted the preliminary injunction, the Secretary withdrew the 2008 rule. On November 18, 2008, the Court dismissed *Van Valin v. Gutierrez* as moot. *Van Valin v. Gutierrez*, 587 F. Supp. 2d 118 (D.D.C. 2008).

### B. Statutory and Regulatory Provisions

Under the Northern Pacific Halibut Act (the "Halibut Act"), 16 U.S.C. §§ 773-773k,

the Secretary has broad authority and discretion to "adopt such regulations as may be necessary to carry out the purposes and objectives of the Convention and the Act." *Id*. § 773c(b)(1); *see* 50 C.F.R. §§ 300.60 - 300.66. The "Convention" referred to is a U.S. - Canadian treaty, the Convention for the Preservation of the Halibut Fishery of the Northern Pacific Ocean and Bering Sea, Ottawa, 1953, 5 U.S.T. 5, T.I.A.S. 2900 (as amended by the Protocol Amending Convention, Washington, 1979, 32 U.S.T. 2483, 2487, T.I.A.S. 9855). Under the Halibut Act, the International Pacific Halibut Commission ("IPHC"), established by Convention, can recommend regulations regarding Northern Pacific Halibut to the U.S. Secretaries of State and Commerce. 16 U.S.C. § 773c(c). If approved by both Secretaries, the Secretary of Commerce promulgates the regulations via publication in the Federal Register. *Id*.; 50 C.F.R. § 300.62.

The Halibut Act also provides the Northern Pacific Management Council (the "Council") with authority to recommend regulations to the Secretary to allocate harvesting privileges among U.S. fishermen. 16 U.S.C. § 773c(c). The Halibut Act requires that allocation determinations be fair and equitable. *Id*. Every year, the IPHC sets the annual total constant exploitation yield ("Total CEY"), that is, the total amount of halibut that may be harvested by all fishing sectors — commercial, sport (charter and unguided), and subsistence — in a given area in a given year. 74 Fed. Reg. at 21194. The IPHC then subtracts estimates of all non commercial removals (including sport, subsistence, bycatch, and waste) to determine the remainder. The remainder constitutes the available commercial catch, *i.e*., the Fishery CEY. *Id*.

In 2003, the Council recommended that the Secretary adopt a guideline harvest policy to use as a benchmark for monitoring the harvest of Pacific halibut. The Secretary adopted the policy and promulgated a regulation, which provides that the guideline harvest level ("GHL") may be

adjusted downward if the IPHC reduces the CEY. 68 Fed. Reg. 47256. The GHL regulations were set up to follow and react to actual harvest figures, *i.e.*, harvest restrictions would be adopted in the year following a year that the GHL was exceeded. "Given the one-year lag between the end of the fishing season and availability of that year's harvest data, management measures in response to the guided recreational fleet's meeting or exceeding the GHL would take up to two years to become effective." *Id*. at 47276. "[I]f the GHL is exceeded in a given year, appropriate harvest reduction measures would be imposed in following years to reduce harvests incrementally by the percentage at which the previous year's harvest exceeded the GHL." 67 Fed. Reg. 3867, 3870 (GHL proposed rule Jan. 28, 2002).

### C. The Current Litigation

In recent years, the charter sector has exceeded its GHL in Area 2C by significant margins: by 22% in 2004, by 36% in 2005, by 26% in 2006, and by 34% in 2007. 73 Fed. Reg. at 78277-78 (proposed rule);[2] *see* 74 Fed. Reg. at 21203 (the charter sector harvest has increased by 107% between 1999 and 2005). Preliminary estimates are that the charter sector harvested more than double the 2008 GHL. 73 Fed. Reg. 78277-78. While it has been the policy of the Council that the charter sector should not exceed the GHL, no regulations have been imposed on the charter sector limiting the charter harvest until the recently promulgated Final Rule. Only the commercial sector has been subject to harvest limits. The commercial sectors' limits have been reduced by 54% between 2005 and 2009. 74 Fed. Reg. at 21207.

The lack of limits on the charter harvest did not pose a problem when the halibut

---

[2] The Final Rule adopts a proposed rule published December 22, 2008, by NMFS at the request of the Council. *See* 73 Fed. Reg. 78276 (Proposed Rule).

biomass was large and the non commercial harvest was small and stable. As part of the normal cycle, the biomass of halibut is declining at this time; however, the charter harvest is escalating. Accordingly, the Council recommended that the charter harvest be regulated, and that the Secretary adopt the Final Rule at issue in this case. The Final Rule limits each charter sport fisherman to one halibut per calendar day based on the GHL. 74 Fed. Reg. 21194.

The Complaint alleges three causes of action: (1) the Secretary violated the APA by promulgating the Final Rule without analyzing whether the allocation of the halibut harvest in Area 2C was fair and equitable; (2) the Secretary violated the APA by unreasonably relying on old data from 1995 through 1999 when it promulgated the GHL in 2003; and (3) the Secretary promulgated the Final Rule in violation of the Halibut Act because the Final Rule does not provide a fair and equitable allocation of the halibut harvest. Plaintiffs seek a preliminary injunction enjoining enforcement of the Final Rule. The Court held a hearing on the motion on June 4, 2009, and denied the motion for the reasons set forth in this Memorandum Opinion.

## II.  STANDARD OF REVIEW

### A.  Preliminary Injunction Factors

A court must consider four factors in deciding whether to issue a preliminary injunction:

1. whether the movant has shown a substantial likelihood of success on the merits;

2. whether the movant would suffer irreparable injury if the injunction is not granted;

3. whether the issuance of a preliminary injunction would cause substantial harm to other interested parties; and

    4.    whether the public interest would be served by the issuance of an injunction.

*Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998). The foregoing factors should be balanced on a "sliding scale," *i.e.*, a lesser showing on one factor can be surmounted by a greater showing on another factor. *CSX Transp., Inc. v. Williams*, 406 F.3d 667 (D.C. Cir. 2005). Even so, in order to justify intruding into the ordinary litigation process by issuing a preliminary injunction, it is critical that a movant 1) make a substantial showing of likelihood of success on the merits, *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 38 F. Supp. 2d 114, 140 (D.D.C. 1999), and 2) make a showing of at least some injury. *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995). A preliminary injunction is "an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).

    B.  Administrative Procedure Act

The APA requires a reviewing court to set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Tourus Records, Inc. v. Drug Enforcement Admin.*, 259 F.3d 731, 736 (D.C. Cir. 2001). In making this inquiry, the reviewing court "must consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989) (internal quotation marks and citation omitted). At a minimum, the agency must have considered relevant data and articulated an explanation establishing a "rational connection between the facts found and the choice made." *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626 (1986). An agency action usually is arbitrary or

capricious if

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

As the Supreme Court has explained, "the scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *see Henley v. FDA*, 77 F.3d 616, 621 (2d Cir. 1996). Rather, the agency action under review is "entitled to a presumption of regularity" and the court must consider only whether the agency decision was based on relevant factors and whether there has been a clear error of judgment. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). In cases involving scientific or technical decisions within the agency's area of expertise, the agency is entitled to a "high level of deference." *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1320 (D.C. Cir. 1998). Regarding fishery management decisions like the one at issue here, it is especially appropriate for a court to defer to the agency's choice of "appropriate conservation and management measures based on [its] evaluations of the relevant quantitative and qualitative factors." *Nat'l Fisheries Inst. v. Mosbacher*, 732 F. Supp. 210, 223 (D.D.C. 1990).

### III. ANALYSIS

A.  Motion for Preliminary Injunction

Plaintiffs have made a clear showing of irreparable harm because they have received cancellations of charter bookings for the 2009 season due to the one-fish limit, causing them great

monetary loss and threatening the very existence of their businesses. *See, e.g.*, Pls.'s Mem. in Supp. of Prelim. Inj. ("Pls.' Mem."), Ex. 3 (Van Valin Aff., indicating that 12 clients for 2009 season cancelled and 42 regular clients declined to book). The charter fishing season is a three-month season beginning on June 1. The Final Rule goes into effect on June 5. If the Final Rule is not enjoined on or close to June 5, Plaintiffs may lose their businesses. The Secretary acknowledged the Final Rule "is likely to have adverse impacts on charter business profitability in 2009 and that some charter operators may fail or leave the business." 74 Fed. Reg. at 21208.

Even so, in order to justify intruding into the ordinary litigation process by issuing a preliminary injunction, Plaintiffs must make a substantial showing of likelihood of success on the merits. *See Am. Bankers*, 38 F. Supp. 2d at 140. This they have failed to do.

First, Plaintiffs' allegation that the Secretary violated the APA by promulgating the Final Rule without analyzing whether the allocation of the halibut harvest in Area 2C was fair and equitable is without merit. The Halibut Act does not require that the Secretary make a specific *finding* regarding fairness and equity; the Act simply requires that any allocation *be* fair and equitable. The Act provides:

> If it becomes necessary to allocate or assign halibut fishing privileges among various United States fishermen, *such allocation shall be fair and equitable* to all such fishermen, based on the rights and obligations in existing Federal law, reasonably calculated to promote conservation, and carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of the halibut fishing privileges.

16 U.S.C. § 773c(c) (emphasis added).

Second, Plaintiffs have not made a substantial showing of likelihood of success on the merits on their claim that the Final Rule is not fair and equitable, as it appears that the Secretary

considered the relevant factors and made a rational determination based on those factors. In examining the administrative record, it is important to understand what the phrase "fair and equitable" means under the statute. The Halibut Act's requirement that any allocation be "fair and equitable" refers to criteria set forth in the Magnuson-Stevens Fishery Conservation Act, 16 U.S.C. § 1853(b)(6). And under the Magnuson Act, NMFS can establish a limited access program to achieve optimum yield in a fishery after taking into account the following factors:

> (1) present participation in the fishery;
>
> (2) historical fishing practices in, and dependence on, the fishery;
>
> (3) the economics of the fishery;
>
> (4) the capability of fishing vessels used in the fishery to engage in other fisheries;
>
> (5) the cultural and social framework relevant to the fishery and any affected communities;
>
> (6) the *fair and equitable distribution of access privileges*; and
>
> (7) any other relevant considerations.

*Id*. § 1853(b)(6) (emphasis added).

National Standard Four of the Magnuson Act addresses allocation of fishing privileges as follows:

> If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.

*Id*. § 1851(a)(4). Regulations implementing National Standard Four provide that the allocation of

fishing privileges should be rationally connected to the furtherance of a legitimate objective and recognize that "[i]nherent in an allocation is the advantaging of one group to the detriment of another." 50 C.F.R. § 600.325(c)(3)(i)(A);[3] *accord Nat'l Fisheries*, 732 F. Supp. at 225 (regulations that made distinctions based on the type of gear used were fair and equitable even though they imposed greater limits on commercial fishermen than on recreational fishermen). "[C]ourts have declined to second-guess the Secretary's judgment simply because the provisions of a [Fishery Management Plan] or a plan allocation 'have a greater impact upon' one group or type of fishermen." *North Carolina Fisheries Ass'n v. Gutierrez*, 518 F. Supp. 2d 62, 89 (D.D.C. 2007) (citing *Nat'l Fisheries*, 732 F. Supp. at 225).

For example, in *National Coalition for Marine Conservation v. Evans*, 231 F. Supp. 2d 119 (D.D.C. 2002), the plaintiffs challenged the closure of a fishing area, asserting that the regulation was unfair to fishermen who owned smaller boats that could not travel beyond the closed area. The court held that the regulation did not violate the equity requirement of National Standard Four because NMFS had properly evaluated the benefits and costs imposed by the closure and had compared the consequences with the status quo and alternative allocation schemes. *Id*. at 131-32.

Similarly, here the Secretary evaluated the benefits and costs imposed by the one-fish bag limit. The Environmental Assessment ("EA")[4] for the Final Rule examined the economic impact of the one-fish limit on the different groups involved in the halibut fishery including: charter boat

---

[3] An allocation is considered equitable where a hardship imposed on one group is outweighed by the benefits received by another. 50 C.F.R. § 600.325(c)(3)(i)(B).

[4] The EA is the March 2009 Regulatory Impact Review/Final Regulatory Flexibility Analysis/Environmental Assessment of the Regulatory Amendment to Implement Guideline Harvest Level Measures in the Halibut Charter Fisheries in International Pacific Halibut Commission Regulatory Area 2C, attached to the Complaint as Exhibit C.

clients, full and half day providers, commercial longline operators, local residents, consumers, and the public.  EA at 31-45; *id*. at 48-49 (Comparative Chart); *see also id*. at 39 (illustrative table estimating potential losses to the commercial sector over the next three years if the status quo is maintained).  The very purpose of this analysis was to evaluate the equities and the impact of the one-fish bag limit and compare it to the status quo.

Further, the Final Rule reveals that the Secretary considered the allocation of the halibut harvest.  The Final Rule was promulgated specifically due to the Secretary's concern regarding allocation:

> Harvests by charter vessel anglers exceeded the GHL in Area 2C each year from 2004 to 2007, and the best available estimates indicate that the 2008 GHL also was exceeded  (Table 1 and Figure 1 of this preamble).  Harvests of halibut by the charter sector above its GHL reduce the Fishery CEY.  By reducing the amount of fish available to the commercial sector, the charter harvests created an allocation concern.  Charter removals should be close to the GHL or the methodology used by the IPHC to determine the Fishery CEY is undermined and results in a *de facto* reallocation from the commercial sector in subsequent years.

74 Fed. Reg. at 21194.[5]  Moreover, the issues of fairness and equity were raised and considered in

---

[5] The preamble also indicates that the Final Rule was based on a conservation concern:

> Charter vessel harvests in excess of the GHL also create a conservation concern by compromising the overall harvest strategy developed by the IPHC to conserve the halibut resource.  The Total CEY and the Fishery CEY have decreased each year since 2004 reflecting declines in the estimated halibut biomass.  As the Total CEY decreases, harvests of halibut should decrease to help conserve the resource.  Hence, the GHL is linked to the Total CEY so that the GHL decreases in a stepwise fashion as the Total CEY decreases.  Despite a decrease in Total CEY and the GHL in recent years, charter vessel harvests have remained high and in excess of the GHL . . . raising the concern that such overharvesting by the charter sector poses a conservation risk . . . .

comments to the Final Rule.  For example, Comment 46 alleged that the IPHC allocation procedures that set the GHL violate fairness and equity, and the Secretary responded:

> Any resource allocation policy likely will result in some resource users feeling unfairly burdened with the costs of reducing their use of the resource.  As the halibut resource has declined in abundance in Area 2C in recent years, the commercial longline fishery's catch limits have been substantially reduced from 10,930,000 lbs [ ] in 2005 to 5,020,000 lbs [ ] in 2009.  This represents a 54 percent reduction over four years.  During part of this period (2005 through 2007) charter vessel anglers in Area 2C have had record high levels of harvest.

74 Fed. Reg. at 21207.  The Secretary promulgated the Final Rule for the very purpose of addressing fairness and equity — in order to address the imbalance caused by the *de facto* reallocation from the commercial industry to the charter industry.  *Id*. at 21214.

Third and finally, Plaintiffs have not shown likelihood of success on the merits of their allegation that  the Secretary violated the APA by unreasonably relying on old data from 1995 through 1999 when it promulgated the GHL in 2003.  The Halibut Act does not indicate what type of scientific evidence the Secretary should use in making allocation decisions.  However, National Standard Two of the Magnuson Act indicates that NMFS should use the "best scientific information available."  16 U.S.C. § 1851(a)(2).  "Far from being rigid, the standard is a practical one requiring only that fishery regulations be diligently researched and based on sound science, such that NMFS is not obliged to rely upon perfect or entirely consistent data."  *North Carolina Fisheries*, 518 F. Supp. 2d at 85 (citing *The Ocean Conservancy v. Gutierrez*, 394 F. Supp. 2d 147, 157 (D.D.C. 2005), *aff'd* 488 F.3d 1020 (D.C. Cir. 2007); internal quotation marks omitted).  Courts have upheld decisions made on the best available evidence, recognizing that some degree of speculation and

---

74 Fed. Reg. at 21194-95.

uncertainty is inherent in the decision-making process.  *Id*.

Comment 34 to the Final Rule asserted that the GHL "was set using incorrect, inconsistent or dated information. . . .  In order for present participation to be properly considered, the Secretary would have to look at more recent catch data for guided anglers and commercial harvesters . . . ."  In response the Secretary explained:

> NMFS disagrees that incorrect, inconsistent or dated information was used for the GHL or this action.  The Council and NMFS have used the best information available at each step of the process, beginning with the GHL, and continuing through this final rule.  The Council and NMFS analyzed and considered data . . . includ[ing] past and present participation, historical dependence of various sectors on the halibut resource, economic impacts of the action on various sectors, cultural and social framework of the various sectors, impacts on other fisheries, and other relevant considerations. . . .  The commenter is referred to the GHL analysis and the analysis that accompanies this action for further details on the data considered in developing these actions.  The GHL analysis is available on the Council Web site at http://www.fakr.noaa.gov/npfmc/current_issues/halibut_issues/halibut.htm[6] and the analysis for this action is available on the NMFS Alaska Region Web site at http://www.alaskafisheries.noaa.gov/sustainablefisheries/halibut/charters.htm.[7]

74 Fed. Reg. at 21204.  As explained above, the EA for the Final Rule examined the economic impact of the one-fish limit on the different groups involved in the halibut fishery.  EA at 31-45; *id*. at 48-49 (Comparative Chart).  Further, the EA included recent data — data from 1995 through 2007 — regarding guided charter participation in the halibut fishery in Area 2C.  *Id*. at 21 (Table 4).  With respect to this third allegation as well, Plaintiffs have failed to make a substantial showing of likelihood of success on the merits.

---

[6] A link to the EA for the 2003 GHL can be found here.

[7] A link to the EA for the 2009 Final Rule can be found here.

B.  Motions for Intervention

On May 26, 2009, the following individuals and organizations moved to intervene as defendants in this suit: (1) commercial fishermen Linda Behnken, Annah Taft Perry, Ryan Nichols, Josh Moore, David Gibson, Sherri and Kurt Wohlhueter, and Christopher Knight; (2) halibut processors Seafood Producers Cooperative, Halibut Association of North America, and North Pacific Seafoods, Inc.; (3) subsistence fisherman Carolyn Heuer; (4) commercial and subsistence fishermen of the Hoonah Indian Association; and (5) the local communities City of Pelican and City of Port Alexander, which benefit from tax collections that arise from commercial earnings. *See* Mot. to Intervene [Dkt. # 4].  Plaintiffs object to intervention for the purpose of challenging the preliminary injunction, but not for the purpose of addressing the merits.  The Secretary takes no position with regard to the motion to intervene.  Then, on June 12, 2009, the Metlakatla Indian Community, which includes subsistence and commercial fishermen, filed a motion to intervene. Plaintiffs and the Secretary take no position on the intervention of the Metlakatla Indian Community and the other proposed intervenors do not oppose.

An applicant may intervene as of right when the applicant (1) makes a timely motion; (2) has an interest relating to the property or transaction which is the subject of the action; (3) is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest; and (4) where the applicant's interests are not adequately represented by the existing parties.  Fed. R. Civ. P. 24(a); *see also Sierra Club v. Van Antwerp*, 523 F. Supp. 2d 5, 6 (D.D.C. 2007). A court, in its discretion, also may permit intervention where the applicant  (1) makes a timely motion; (2) has a claim or defense; and (3) that claim or defense shares with the main action a common question of law or fact.  Fed. R. Civ. P. 24(b); *see also EEOC v. Nat'l Children's*

*Ctr.*, 146 F.3d 1042, 1046 (D.C. Cir. 1998).

When confronted with a substantially similar motion to intervene in the 2008 litigation, the Court allowed permissive intervention (and not intervention as of right) with regard to the merits of this case and not with regard to the question of preliminary injunction. The Court explained:

> [T]he Court will not permit intervention for the purpose of challenging the preliminary injunction for two reasons. First, the motion to intervene was not timely with regard to the preliminary injunction issue. The original motion was not filed until after the temporary restraining order and only two days before the preliminary injunction hearing. *See, e.g.*, *Doe v. Duncanville Ind. School Dist.*, 994 F.2d 160, 167 (5th Cir. 1993) (district court properly denied motion to intervene as untimely when it was filed two days before the hearing on the motion for preliminary injunction). Second, the motion to intervene does not establish standing to intervene with regard to the preliminary injunction, as the Proposed Intervenors have not shown that they would be negatively impacted by the preliminary injunction. To demonstrate standing, a plaintiff must establish: "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).
>
> Temporary injunctive relief in this case will not affect the quota of halibut allocated to commercial fishermen in 2008. The total allowable catch for the commercial sector was set by the International Pacific Halibut Commission ("IPHC") and the Secretary for the 2008 season, and a delay in the effectiveness of the Final Rule will have no impact on the allowable harvest for the commercial sector for 2008. *See* 73 Fed. Reg. 12280 (Mar. 7, 2008). Thus, the 2008 commercial harvest will not be affected by the preliminary injunction. Therefore, the halibut processors to whom the commercial fishermen sell fish and the communities to whom they pay taxes will not be affected by the preliminary injunction. Similarly, there is no showing that Proposed Intervenor Carolyn Heuer, a subsistence fisherman, would be impacted by the preliminary injunction. Neither the preliminary

injunction nor the Final Rule affects subsistence fishermen.[8]

*Van Valin v. Gutierrez*, No. 08-941 (D.D.C.) (Order filed Aug. 19, 2008 [Dkt. # 30]).

Like in the 2008 case, permissive intervention is allowed with regard to the merits and not the issue of preliminary injunction. The motions to intervene do not establish standing to intervene with regard to the preliminary injunction because the proposed intervenors have not shown that they would be negatively impacted by a grant or denial of preliminary injunction. Temporary injunctive relief (or denial of such relief) will not affect the quota of halibut allocated to commercial fishermen in 2009 because the total allowable catch for the commercial sector has been set for the 2009 season. Further, the IPHC has stated that if the one-fish rule does not become effective, it would consider further regulations on the charter sector, not the commercial sector.[9]

Because the 2009 commercial harvest would not be affected by a preliminary injunction, the halibut processors to which the commercial fishermen sell fish and the communities to which they pay taxes will not be affected by the preliminary injunction. Similarly, there is no showing that subsistence fishermen would be impacted by the grant or denial of a preliminary injunction. The subsistence sector is treated like the recreational sector — the subsistence catch, the sport catch, bycatch, and wastage are deducted from the CEY to arrive at the allowable commercial catch. In the short term, the subsistence fishermen will not be affected by any limits, or lack thereof, placed on the charter sector. Therefore, intervention will be permitted, limited to the merits of this

---

[8] Subsistence harvests were not restricted by the 2008 rule. *See* 73 Fed. Reg. at 30518 (resp. to cmmt. 84).

[9] The IPHC commented on what it might do if the one-fish rule were enjoined in its Jan. 20, 2009 News Release, available at http://www.iphc.washington.edu/halcom/newsrel/2009/nr20090120.htm (last visited June 10, 2009).

case.

## IV.  CONCLUSION

For the reasons set forth above, Plaintiffs' motion for preliminary injunction [Dkt. # 2] is denied.  The motions to intervene as defendants [Dkts. ## 4 & 10] are denied in part and granted in part.  Intervention is denied with regard to the question of a preliminary injunction, and permissive intervention is granted with regard to the merits of this case.  A memorializing order accompanies this Memorandum Opinion.


Date: June 25, 2009                         _____/s/_____
                                            ROSEMARY M. COLLYER
                                            United States District Judge