# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SCOTT VAN VALIN, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **Civil Action No. 09-961 (RMC)** |
| | ) | |
| GARY LOCKE, Secretary, | ) | |
| Department of Commerce, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION

Pacific halibut are a highly desired catch off the coast of Southeast Alaska. This lawsuit pits operators of charter fishing vessels ("Charter Operators")[1] against the local commercial and subsistence halibut fishermen. Through the National Marine Fisheries Service ("NMFS"), the Secretary of Commerce has issued a formal Rule limiting customers on guided sport boats to a catch of one halibut per calendar day. *See* 74 Fed. Reg. 21194 (adopted May 6, 2009; effective June 5, 2009); 50 C.F.R. § 300.65(d)(2). The Charter Operators contend that the Secretary[2] failed to explain why limiting the charter sector to a harvest level adopted in 2003 was fair and equitable. The

---

[1] Plaintiffs are the following Charter Operators in Area 2C of Southeast Alaska: Scott Van Valin, Ken Dole, Rick Bierman, Theresa Weiser, Donald Westlund, and Richard Yamada.

[2] Defendants are: Gary Locke, Secretary of the Department of Commerce; Dr. Jane Lubchenco, Administrator of the National Oceanic and Atmospheric Administration; and Dr. James Balsinger, Acting Assistant Administrator of NMFS. NMFS is a division of the National Oceanic and Atmospheric Administration, an agency within the Department of Commerce. For ease of reference, Defendants are collectively referred to as "the Secretary."

Secretary and Intervenors[3] oppose.  Because the record as a whole reflects that the Secretary adequately considered the equities of the allocation of the halibut harvest, the Secretary's decision was not arbitrary, capricious, or contrary to law.  The Secretary and Intervenors' motions for summary judgment will be granted, and the Charter Operators' cross motion for summary judgment will be denied.

## I.  FACTS

### A.  Statutory and Regulatory Provisions

Under the Northern Pacific Halibut Act (the "Halibut Act"), 16 U.S.C. §§ 773-773k, the Secretary has broad authority and discretion to "adopt such regulations as may be necessary to carry out the purposes and objectives of the Convention and the Act."  *Id*. § 773c(b)(1); *see* 50 C.F.R. §§ 300.60 - 300.66.  The "Convention" referred to is a treaty between the United States and Canada called the Convention for the Preservation of the Halibut Fishery of the Northern Pacific Ocean and Bering Sea, Ottawa, 1953, 5 U.S.T. 5, T.I.A.S. 2900 (as amended by the Protocol Amending Convention, Washington, 1979, 32 U.S.T. 2483, 2487, T.I.A.S. 9855).  Under the Halibut Act, the International Pacific Halibut Commission ("IPHC"), established by the Convention, can recommend regulations regarding Northern Pacific Halibut to the U.S. Secretaries of State and

---

[3] The following individuals and organizations intervened as defendants:  (1) commercial fishermen Linda Behnken, Annah Taft Perry, Ryan Nichols, Josh Moore, David Gibson, Sherri and Kurt Wohlhueter, and Christopher Knight; (2) halibut processors Seafood Producers Cooperative, Halibut Association of North America, and North Pacific Seafoods, Inc.; (3) subsistence fisherman Carolyn Heuer; (4) commercial and subsistence fishermen of the Hoonah Indian Association; and (5) the local communities City of Pelican and City of Port Alexander, which benefit from tax collections that arise from commercial earnings.  They are collectively referred to as the "Behnken Group."  The Metlakatla Indian Community, which includes subsistence and commercial fishermen, also intervened as defendants.  The Behnken Group and the Metlakatla are collectively referred to as the "Intervenors."  The Intervenors support the Final Rule at issue in this case.

Commerce.  16 U.S.C. § 773c(c).  If approved by both Secretaries, the Secretary of Commerce promulgates the regulations via publication in the Federal Register.  *Id*.; 50 C.F.R. § 300.62.

The Halibut Act also provides the Northern Pacific Management Council (the "Council") with authority to recommend regulations to the Secretary to allocate harvesting privileges among U.S. fishermen.  16 U.S.C. § 773c(c).  The Halibut Act requires allocation determinations to be fair and equitable.  *Id*.  Every year, the IPHC sets the annual total constant exploitation yield ("Total CEY"), that is, the total amount of halibut that may be harvested by all fishing sectors — commercial, sport (charter and unguided), and subsistence — in a given area in a given year.  74 Fed. Reg. at 21194.  The IPHC then subtracts estimates of all non-commercial removals (including sport, subsistence, bycatch, and waste) to determine the remainder.  The remainder constitutes the available commercial catch, *i.e.*, the "Fishery CEY."  *Id*.

In 2003, the Council recommended that the Secretary adopt a guideline harvest policy to use as a benchmark for monitoring the charter harvest of Pacific halibut.  The Secretary adopted the policy and promulgated a regulation, which provides that the Guideline Harvest Level (or "GHL") may be adjusted downward if the IPHC reduces the CEY.  *See* 68 Fed. Reg. 47256 (the "GHL regulations").  The GHL was intended to represent a pre-season specification of an acceptable annual harvest by the charter sector in management Areas 2C and 3A.  *Id*. at 47258.  The GHL regulations establish the total maximum poundage for the charter vessel fishery each year according to a predetermined formula that depends on that year's CEY.  *Id*. at 47259.

The GHL regulations struck a balance between maintaining historical fishing practices in what had been a predominantly commercial fishery while allowing growth in the newer guided sport fishing sector.  The regulations achieved this balance by allocating to the charter fishery

an additional 25% above what it was harvesting at the time.  "[T]he goal for the GHL was to provide a limit on the total amount of harvests in the guided fishery that would be designated as a fixed poundage based on an amount equal to 125 percent of the average 1995-1999 harvests.  This amount was set higher than existing harvest levels to accommodate some future growth in the recreational sector."  68 Fed. Reg. at 47259; *see also* 72 Fed. Reg. 74257, 74259 (Dec. 31, 2007) (the GHL regulations allocated to the charter sector 25% more than the average of the guided sport harvest in 1995-1999, a time when the halibut biomass was high).

The 2003 GHL regulations did not actually limit harvests by charter vessel fishermen; they merely set benchmarks for use in future regulation.  AR 32, March 2009 Environmental Assessment ("EA")[4] at 18.[5]  Charter harvests can be regulated by subsequent regulation, like the Final Rule at issue here.

The GHL regulations were set up to follow and react to actual harvest figures, *i.e.*, harvest restrictions could be adopted in the year following a year that the Guideline Harvest Level

---

[4] The EA is the March 2009 Regulatory Impact Review/Final Regulatory Flexibility Analysis/Environmental Assessment of the Regulatory Amendment to Implement Guideline Harvest Level Measures in the Halibut Charter Fisheries in International Pacific Halibut Commission Regulatory Area 2C.

[5] Originally, the Council proposed that the GHL be enforced via a framework of predetermined and nondiscretionary harvest restrictions that would be implemented automatically each year depending on how much the prior year's GHL was exceeded.  This proposal ran afoul of the requirement of notice and comment rulemaking under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq*.  Thus, the 2003 GHL benchmarks were implemented, but actual harvest restrictions must be the subject of notice and comment rulemaking, as was the Final Rule imposing the one halibut bag limit.  *See* 68 Fed. Reg. at 47259 ("This final rule imposes no restrictions on the guided recreational fishery as outlined in the proposed rule.  This change from the proposed rule is necessary to address concerns raised about the ability to implement the harvest restriction measures without providing opportunity for public comment under APA rulemaking procedures.").

was exceeded.[6]  From 2004 to 2007, the GHL in Area 2C was 1.432 million pounds.  74 Fed. Reg. at 21207; EA at 18.  In 2008, in response to a reduction in the CEY estimated by the IPHC, the charter GHL was reduced substantially to 931,000 pounds.  In 2009, the charter GHL was reduced to 788,000 pounds.  74 Fed. Reg. at 21207.  If the halibut stock rebounds, the GHL will increase. *See* 50 C.F.R. § 300.65(c).

### C.  The Current Litigation

In recent years, the guided sport sector has exceeded the Guideline Harvest Level in Area 2C by significant margins:  by 22% in 2004; by 36% in 2005; by 26% in 2006; and by 34% in 2007.  73 Fed. Reg. 78276, 78277-78 (Dec. 22, 2008 Proposed Rule).[7]  In 2008, the charter sector harvested an estimated 1.914 million pounds of halibut, more than double the 2008 Guideline Harvest Level.  *See* EA at 9 (2008 charter harvest was 983,000 pounds above the 2008 GHL); *see also* 73 Fed. Reg. at 78277-78.  No regulations had been imposed on the charter sector limiting the annual charter harvest until the recently promulgated Final Rule.[8]  Only the commercial sector has

---

[6] "Given the one-year lag between the end of the fishing season and availability of that year's harvest data, management measures in response to the guided recreational fleet's meeting or exceeding the GHL would take up to two years to become effective."  68 Fed. Reg. at 47257.  "[I]f the GHL is exceeded in a given year, appropriate harvest reduction measures would be imposed in following years to reduce harvests incrementally by the percentage at which the previous year's harvest exceeded the GHL."  67 Fed. Reg. 3867, 3870 (GHL Proposed Rule Jan. 28, 2002).

[7] The Final Rule adopted the December 22, 2008, Proposed Rule.

[8] This is the Secretary's second attempt to limit charter fishermen to a one-fish daily bag limit in Area 2C.  A substantially similar group of plaintiffs challenged a rule that imposed a one-halibut-per-day limit in 2008.  *See Van Valin v. Gutierrez*, No. 08-941 (D.D.C.) (challenging 73 Fed. Reg. 30504 (May 28, 2008 final rule).  In that case, the Court granted the plaintiffs' motion for a preliminary injunction, enjoining the enforcement of the 2008 rule.  *See id.*, Order [Dkt. # 22].  The Court found that plaintiffs had shown a likelihood of success on the merits on their claim under the APA that the Secretary violated agency regulations.  The 2008 rule limited the halibut harvest by the charter sector in anticipation of the projected 2008 harvest — instead of regulating to a past GHL

been subject to annual harvest limits, and their limits have been reduced by 54% between 2005 and 2009.  74 Fed. Reg. at 21207; *see also id*. at 21196 ("A major user group, the commercial setline fishery, has a strictly managed annual catch limit.").

The lack of limits on the charter harvest did not pose a problem when the halibut biomass was large and the non-commercial harvest was small and stable.  However, the charter harvest has been steadily escalating.  *See* 74 Fed. Reg. at 21203 (the charter sector harvest has increased by 107% between 1999 and 2005).  And the biomass of halibut is declining at this time. Accordingly, the Council recommended that the charter harvest be regulated, and the Secretary of Commerce adopted the Final Rule at issue in this case, limiting each charter sport fisherman in Area 2C to one halibut per calendar day.  *See* 74 Fed. Reg. 21194 (effective June 5, 2009).

The Complaint alleges three causes of action.  In Count I, The Charter Operators allege that the Secretary violated the APA, 5 U.S.C. § 504, by promulgating the Final Rule without analyzing whether the allocation of the halibut harvest in Area 2C was fair and equitable as required by the Halibut Act, 16 U.S.C. § 733c(c).  Compl. ¶¶ 47-48.  Count II alleges that the Secretary violated the APA, 5 U.S.C. § 504, and the Halibut Act, 16 U.S.C. §§ 733c(c) & 1853(b)(6), by basing the Final Rule on the 2003 GHL, which was in turn based on "old" data from 1995 through 1999.  The Charter Operators contend that the Secretary should have relied on "more recent and readily available information."  *Id*. ¶¶ 49-50.  Finally, Count III asserts that the Secretary promulgated the Final Rule in violation of the Halibut Act because the Final Rule does not provide a fair and equitable allocation of the halibut harvest.  The Final Rule allegedly imposes harm on the

---

as contemplated by the 2003 GHL regulations.  The Secretary then withdrew the 2008 rule.  As a result, the Court dismissed the case as moot.  *See Van Valin v. Gutierrez*, 587 F. Supp. 2d 118, 120-21 (D.D.C. 2008).

charter sector without a reasonably proportionate benefit to the commercial sector.  Further, the Secretary allegedly failed to consider recent growth in the unguided and subsistence sectors.  *Id*. ¶¶ 51-52.

       The Charter Operators sought a preliminary injunction enjoining enforcement of the Final Rule, and the Court denied the motion, finding that the Charter Operators had not shown the likelihood of success on the merits.  *See Van Valin v. Locke*, 628 F. Supp. 2d 67, 73-76 (D.D.C. 2009).  Now the parties have filed cross motions for summary judgment.

## II.  LEGAL STANDARDS

### A.  Summary Judgment

       Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *see also Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995).  Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

       In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252.  In addition, the nonmoving

party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Id.* at 675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## B. Administrative Procedure Act

The APA, 5 U.S.C. § 551 *et seq.*, requires a reviewing court to set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Tourus Records, Inc. v. Drug Enforcement Admin.*, 259 F.3d 731, 736 (D.C. Cir. 2001). In making this inquiry, the reviewing court "must consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989) (internal quotation marks and citation omitted). At a minimum, the agency must have considered relevant data and articulated an explanation establishing a "rational connection between the facts found and the choice made." *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626 (1986). An agency action usually is arbitrary or capricious if

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

As the Supreme Court has explained, "the scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."

*Id.*; *see Henley v. FDA*, 77 F.3d 616, 621 (2d Cir. 1996).  Rather, the agency action under review is "entitled to a presumption of regularity" and the court must consider only whether the agency decision was based on relevant factors and whether there has been a clear error of judgment. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).  In cases involving scientific or technical decisions within the agency's area of expertise, the agency is entitled to a "high level of deference." *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1320  (D.C. Cir. 1998).  Regarding fishery management decisions like the one at issue here, it is especially appropriate for a court to defer to the agency's choice of  "appropriate conservation and management measures based on [its] evaluations of the relevant quantitative and qualitative factors." *Nat'l Fisheries Inst. v. Mosbacher*, 732 F. Supp. 210, 223 (D.D.C. 1990).

## III.  ANALYSIS

### A.  Allegation that the Halibut Act Requires a Finding of Fairness and Equity

Count I of the Complaint alleges that the Secretary violated the APA by promulgating the Final Rule without analyzing whether the allocation of the halibut harvest in Area 2C was fair and equitable "as is required by section 5(c) of the Halibut Act."  Compl. ¶ 48.  This allegation is based on the false premise that the Halibut Act requires the Secretary to make a specific *finding* regarding fairness and equity.  The Halibut Act contains no such requirement.  The Act provides:

> If it becomes necessary to allocate or assign halibut fishing privileges among various United States fishermen, *such allocation shall be fair and equitable* to all such fishermen, based on the rights and obligations in existing Federal law, reasonably calculated to promote conservation, and carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of the halibut fishing privileges.

-9-

16 U.S.C. § 773c(c) (emphasis added).  The Act does not require that the Secretary make a finding of fairness and equity; it simply requires that any allocation *be* fair and equitable.  Because the Halibut Act does not require the Secretary to make such a finding, the lack of such a finding cannot violate the APA.  Thus, summary judgment will be granted in favor of the Secretary on Count I of the Complaint.

### B.  Allegation that the Final Rule Is Not Fair and Equitable

Count III of the Complaint alleges that the Final Rule is not fair and equitable under the Halibut Act because it does not fairly and equitably allocate the halibut harvest.  The Charter Operators contend that the Final Rule imposes harm on the guided sport sector without a reasonably proportionate benefit to the commercial sector and that the Secretary failed to consider recent growth in the unguided and subsistence sectors.  Compl. ¶¶ 51-52.  They do not challenge "NMFS basic statutory authority to adopt harvest restrictions designed to implement permissible allocation objectives" or "whether the means that NMFS chose are permissible;" they only challenge "whether NMFS has adequately explained *why* it chose the particular outcome it did."  Pls.' Mem. in Supp. of Mot. for Summ. J. [Dkt. # 17] ("Pls.'s Mem.") at 2 & 13 (emphasis in original).

To determine whether the allocation made by the Secretary was fair and equitable and whether the Secretary adequately explained the rationale behind the Final Rule, the Court must examine the record as a whole.  *See, e.g., San Luis & Delta-Mendota Water Auth. v. Salazar*, Civ. No. 09-407, 2009 WL 3428487, at *19 (E.D. Cal. Oct. 15, 2009) (agency's action may be upheld if its reasoning can be discerned on the basis of the entire record).  The Secretary must have considered relevant data and articulated an explanation establishing a "rational connection between the facts found and the choice made."  *Bowen*, 476 U.S. at 626.  The Administrative Record reflects that the

-10-

Secretary considered the relevant factors and made a rational determination based on those factors.

The Halibut Act's requirement that any allocation be "fair and equitable" refers to criteria set forth in the Magnuson-Stevens Fishery Conservation Act ("Magnuson Act"), 16 U.S.C. § 1853(b)(6).  Under the Magnuson Act, NMFS can establish a limited access program to "achieve optimum yield" in a fishery after taking into account the following factors:

> (1) present participation in the fishery;
>
> (2) historical fishing practices in, and dependence on, the fishery;
>
> (3) the economics of the fishery;
>
> (4) the capability of fishing vessels used in the fishery to engage in other fisheries;
>
> (5) the cultural and social framework relevant to the fishery and any affected communities;
>
> (6) the *fair and equitable distribution of access privileges*; and
>
> (7) any other relevant considerations.

16 U.S.C. § 1853(b)(6) (emphasis added).

National Standard Four of the Magnuson Act addresses fairness and equity in the allocation of fishing privileges as follows:

> If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.

*Id*. § 1851(a)(4).  Regulations implementing National Standard Four provide that the allocation of fishing privileges should be rationally connected to the furtherance of a legitimate objective and recognize that "[i]nherent in an allocation is the advantaging of one group to the detriment of

another." 50 C.F.R. § 600.325(c)(3)(i)(A);[9] *accord Nat'l Fisheries*, 732 F. Supp. at 225 (regulations that made distinctions based on the type of gear used were fair and equitable even though they imposed greater limits on commercial fishermen than on recreational fishermen).

"[C]ourts have declined to second-guess the Secretary's judgment simply because the provisions of a [Fishery Management Plan] or a plan allocation 'have a greater impact upon' one group or type of fishermen." *North Carolina Fisheries Ass'n v. Gutierrez*, 518 F. Supp. 2d 62, 89 (D.D.C. 2007) (citing *Nat'l Fisheries*, 732 F. Supp. at 225). "[T]he Secretary is allowed, under [National Standard Four], to sacrifice the interests of some groups of fishermen, for the benefit as the Secretary sees it of the fishery as a whole." *Alliance Against IFQs v. Brown*, 84 F.3d 343, 350 (9th Cir. 1996). In *Alliance Against IFQs*, the Ninth Circuit held that quotas that effectively shut out of the fishery crewmen who did not own fishing boats in favor of those who owned or leased boats did not violate National Standard Four. Despite the harshness to the non-owning crewmen and the fact that "[a]lternative schemes can easily be imagined," the court found that the regulations were not arbitrary and capricious because the Secretary considered their interests and other relevant factors and articulated a rational connection between the facts found and the choice made. *Id*. at 350, 352.

Similarly, in *National Coalition for Marine Conservation v. Evans*, 231 F. Supp. 2d 119 (D.D.C. 2002), fishermen who owned small boats challenged the closure of a fishing area, asserting that the regulation was unfair to fishermen who owned smaller boats that could not travel beyond the closed area. The court held that the regulation did not violate the equity requirement of National Standard Four because NMFS had properly evaluated the benefits and costs imposed by

---

[9] An allocation is considered equitable where a hardship imposed on one group is outweighed by the benefits received by another. 50 C.F.R. § 600.325(c)(3)(i)(B).

the closure and had compared the consequences with the status quo and alternative allocation schemes. *Id*. at 131-32.

The Charter Operators erroneously argue that the Secretary did not analyze whether the 2009 allocation based on the GHL is fair and equitable and that the Secretary's "entire rationale" that the 2009 allocation is fair and equitable is that the allocation represented by the Guideline Harvest Levels were determined to be fair in 2003. Pls.' Mem. at 36-37. This allegation is belied by substantial evidence in the Administrative Record that the Secretary considered fairness and equity in establishing the 2009 allocation. The Secretary evaluated the benefits and costs to different groups that would be imposed by a one-fish bag limit. The Environmental Assessment for the Final Rule examined the economic impact of the one-fish limit on the following groups: charter boat clients, full and half day providers, commercial longline operators, local residents, consumers, and the public. EA at 31-45; *id*. at 48-49 (Comparative Chart); *see also id*. at 39 (illustrative table estimating potential losses to the commercial sector over the next three years if the status quo is maintained). The very purpose of this analysis was to evaluate the equities and the impact of the one-fish bag limit and compare it to the status quo.

In addition to evaluating the status quo, the Secretary considered the *de facto* allocation of the Pacific halibut harvest in the past. Historically, the Pacific halibut fishery has been mostly a commercial fishery. Between 1997 and 2007, the average annual harvest was approximately 76% commercial, 20% sport (including guided and unguided), and the remainder was subsistence, bycatch and wastage.[10] 73 Fed. Reg. at 78277. The Secretary has been concerned about

_____

[10] While the Final Rule and the GHL regulations did not split the permissible harvest evenly between the commercial sector and the charter sector, that does not mean that the allocation fails to meet the "fair and equitable" requirement. The harvest has never been shared equally by the

the expansion of the guided sport sector since the 1995 problem statement was drafted by the

Council continuing through the time the Final Rule was promulgated.

> The 1995 problem statement (as revised in the 2001 GHL analysis) demonstrates the Council was concerned about the expansion of the halibut charter industry and how that expansion may affect "the Council's ability to maintain the stability, economic viability, and diversity of the halibut charter industry, the quality of the recreational experience, the access of subsistence users, and the socioeconomic well-being of the coastal communities dependent on the halibut resource." The Council went on to indicate six issues of particular concern, including the absence of limits on the annual harvest of halibut by the guided sector and the rapid growth in that sector, which amounted to an "open-ended reallocation from the commercial fishery to the charter industry."

74 Fed. Reg. at 21214.

The issues of fairness and equity were raised in comments to the Final Rule. For

example, Comment 46 alleged that the IPHC allocation procedures that set the GHL violate fairness

and equity, and the Secretary responded:

> Any resource allocation policy likely will result in some resource users feeling unfairly burdened with the costs of reducing their use of the resource. As the halibut resource has declined in abundance in Area 2C in recent years, the commercial longline fishery's catch limits have been substantially reduced from 10,930,000 lbs [ ] in 2005 to 5,020,000 lbs [ ] in 2009. This represents a 54 percent reduction over four years. During part of this period (2005 through 2007) charter vessel anglers in Area 2C have had record high levels of harvest.

Id. at 21207. The Secretary promulgated the Final Rule in order to address the imbalance caused by

the de facto reallocation from the commercial industry to the charter industry caused by the charter

sector's rapidly increasing harvests in recent years. The Secretary indicated:

---

commercial and the charter sectors.

-14-

> Harvests by charter vessel anglers exceeded the GHL in Area 2C each
> year from 2004 to 2007, and the best available estimates indicate that
> the 2008 GHL also was exceeded  (Table 1 and Figure 1 of this
> preamble).  Harvests of halibut by the charter sector above its GHL
> reduce the Fishery CEY.  By reducing the amount of fish available to
> the commercial sector, the charter harvests created an allocation
> concern.  Charter removals should be close to the GHL or the
> methodology used by the IPHC to determine the Fishery CEY is
> undermined and results in a *de facto* reallocation from the
> commercial sector in subsequent years.

*Id*. at 21194.  The Secretary intended the Final Rule to "limit the use of halibut by one sector that has

grown significantly in proportion to the other sectors that harvest halibut," that is, to "limit the

growth of one sector and the resulting reallocation from other sectors that use the same finite

resource."  *Id*. at 21214-15.

In addition to considering the allocation of the halibut harvest, the Secretary evaluated

the conservation of the halibut resource.  Where multiple user groups are involved, "conservation

and allocation cannot be separated."  *Id*. at 21196.  The guided sport sector's overharvesting

potentially undermines IPHC's conservation and management goals for the overall halibut stock.

Thus, the Final Rule was based in part, on a conservation concern:

> Charter vessel harvests in excess of the GHL also create a
> conservation concern by compromising the overall harvest strategy
> developed by the IPHC to conserve the halibut resource.  The Total
> CEY and the Fishery CEY have decreased each year since 2004
> reflecting declines in the estimated halibut biomass.  As the Total
> CEY decreases, harvests of halibut should decrease to help conserve
> the resource.  Hence, the GHL is linked to the Total CEY so that the
> GHL decreases in a stepwise fashion as the Total CEY decreases.
> Despite a decrease in Total CEY and the GHL in recent years, charter
> vessel harvests have remained high and in excess of the GHL.  As
> conservation of the halibut resource is the overarching goal of the
> IPHC, the magnitude of charter vessel harvest over the GHL in Area
> 2C has raised concern that such excessive harvests by the charter
> sector pose a conservation risk, with the potential to undermine the
> IPHC's conservation and management goals for the overall halibut

> stock. Therefore, restraining charter sector harvests to approximately
> the GHL would contribute to the conservation of the halibut resource.

*Id*. at 21194-95; *see also* EA at 18. "[A] reduction in the charter vessel harvest should leave more

halibut in the water to the benefit of all fisheries now and in future years, as well as benefit the health

and reproductive potential of the resource." 74 Fed. Reg. at 21199; *see also id*. at 21212 ("[L]eaving

fish unharvested contributes to biomass and Total CEY in subsequent years.").

  The Charter Operators also contend that the Final Rule is inequitable because the

hardship imposed on the guided sport industry is not outweighed by the total benefit received by the

commercial industry. The national benefits of an allocation are not judged solely in terms of a

cost/benefit analysis between two groups. As explained in detail above, the Secretary properly

considered the seven factors set out in the Magnuson Act, 16 U.S.C. § 1853(b)(6), including fairness

and equity and National Standard Four, *id*. § 1851(a)(4). And the Secretary considered the economic

impact of the one-fish limit on numerous groups, including local residents, consumers, and the

public, not just the charter and commercial industries. *See* EA at 31-45; *id*. at 48-49 (Comparative

Chart). Furthermore, the Secretary gave little weight to quantitative estimates of the economic

impact of the Rule because it is not appropriate to compare the economic impact to the commercial

sector with the economic impact to the charter sector when their products are so very different. 74

Fed. Reg. at 21212-13. The charter sector's product is the "fishing experience" while the

commercial sector's product is "halibut sold in competitive markets." *Id*. at 21213.

  When determining fairness and equity the focus is not on the impact of the regulation,

but on its purpose. So long as the motive behind the regulation is justified in terms of the fishery

management objective, advantaging one group over another is permissible under Standard Four. 50

C.F.R. § 600.325(c)(3)(i)(A); *see also Alliance Against IFQs*, 84 F.3d at 350. The motive behind

-16-

the Final Rule was justified in terms of fairness and equity; the Secretary considered the allocation of the halibut resource and conservation of the halibut resource in proper historical context.

The Charter Operators also argue that the 2003 GHL regulations were not fair and equitable and that there was no attempt to make them so because those regulations merely set benchmarks and did not limit the halibut harvest.   This argument is unsupported by the Administrative Record.   The 2003 GHL regulations set the charter sector GHL at 125% of the amount that the charter sector was then harvesting, 68 Fed. Reg. at 47259, a clear attempt to be fair and permit growth in the burgeoning charter industry.   The 2003 GHL regulations explained that "[t]he GHL establishes a pre-season estimate of acceptable annual harvests for the guided recreational halibut fishery" and that further regulations could be implemented via notice and comment rulemaking as needed in the future.   *Id.* at 47258-59.   The GHLs were intended to "trigger other management measures in years following attainment of the GHL" in order to "maintain a stable guided recreational fishery season of historic length, using area-specific measures."   *Id.* at 47259.

### C.  Allegation that the Secretary Improperly Relied on Stale Data

Count II of the Complaint asserts that the Secretary violated the APA and the Halibut Act by basing the Final Rule on the 2003 GHL, which was in turn based on allegedly stale data from 1995 through 1999.   The Charter Operators argue that the Secretary should have relied on "more recent and readily available information."   Compl. ¶¶ 49-50.

The Halibut Act does not indicate what type of scientific evidence the Secretary should use in making allocation decisions.   However, National Standard Two of the Magnuson Act indicates that NMFS should use the "best scientific information available."   16 U.S.C. § 1851(a)(2). "Far from being rigid, the standard is a practical one requiring only that fishery regulations be

diligently researched and based on sound science, such that NMFS is not obliged to rely upon perfect or entirely consistent data." *North Carolina Fisheries*, 518 F. Supp. 2d at 85 (citing *The Ocean Conservancy v. Gutierrez*, 394 F. Supp. 2d 147, 157 (D.D.C. 2005) (internal quotation marks omitted)). Courts have upheld decisions made on the best available evidence, recognizing that some degree of speculation and uncertainty is inherent in the decision-making process. *See id*.

The allegation that the Final Rule relied on out-of-date data was raised in Comment 34 to the Final Rule, which asserted that the GHL "was set using incorrect, inconsistent or dated information" and that "for present participation to be properly considered, the Secretary would have to look at more recent catch data for guided anglers and commercial harvesters . . . ." 74 Fed. Reg. at 21204. In response the Secretary explained:

> NMFS disagrees that incorrect, inconsistent or dated information was used for the GHL or this action. *The Council and NMFS have used the best information available at each step of the process, beginning with the GHL, and continuing through this final rule. The Council and NMFS analyzed and considered data . . . includ[ing] past and present participation*, historical dependence of various sectors on the halibut resource, economic impacts of the action on various sectors, cultural and social framework of the various sectors, impacts on other fisheries, and other relevant considerations. . . . The commenter is referred to the GHL analysis and the analysis that accompanies this action for further details on the data considered in developing these actions. The GHL analysis is available on the Council Web site at http://www.fakr.noaa.gov/npfmc/current_issues/halibut_issues/halibut.htm[11] and the analysis for this action is available on the NMFS Alaska Region Web site at http://www.alaskafisheries.noaa.gov/sustainablefisheries/halibut/charters.htm.[12]

*Id*. (emphasis added). The Secretary did examine present participation levels. *See, e.g.*, EA at 9

---

[11] A link to the EA for the 2003 GHL can be found here.

[12] A link to the EA for the 2009 Final Rule can be found here.

(2008 charter harvest was 983,000 pounds above the 2008 GHL); 74 Fed. Reg. at 21207 (the commercial sector has been subject to annual harvest limits, and their limits have been reduced by 54% between 2005 and 2009).

While present participation in the fishery is one factor that the Secretary must examine when considering fishery management measures, another factor is historic harvest participation levels. *See* 16 U.S.C. § 1853(b)(6) (one of the factors to be considered under the Magnuson Act is historic participation and dependence on the fishery). In *Yakutat v. Gutierrez*, 407 F.3d 1054 (9th Cir. 2005), the plaintiffs challenged the Secretary's decision to limit the number of boats fishing for Pacific cod by granting licenses only to boats that caught a prescribed amount of fish during any two years between 1995-1998, and excluding 1999 as a qualifying year. The plaintiffs contended that the exclusion of 1999 was unfair and inequitable because it failed to take into account the most recent participation in the fishery. The court found that it was permissible for the Secretary to place a higher premium on historical participation in the fishery rather than focusing solely on present participation. *Id*. at 1073. When promulgating the Final Rule, the Secretary examined the historical participation in the Pacific halibut harvest and the charter fishery's excessive harvests in recent years.[13] Overfishing by the guided sport sector was the very thing that compelled the Secretary to promulgate the Final Rule. *See* 74 Fed. Reg. at 21194.

Where overfishing by one group in recent years is the precise concern that the regulation intends to address, it makes sense to disregard the most recent participation data. *See, e.g., Alliance Against IFQs*, 84 F.3d at 347-48 (NMFS had good reason to disregard participation

---

[13] The EA included recent data — data from 1995 through 2007 — regarding guided charter participation in the halibut fishery in Area 2C. EA at 21 (Table 4).

data where consideration of that data would have encouraged the overharvesting that the regulatory scheme was meant to restrain). The charter sector exceeded the GHL by 22% in 2004; by 36% in 2005; by 26% in 2006; and by 34% in 2007. 73 Fed. Reg. at 78277-78. And in 2008, the guided sport industry harvested more than double the 2008 Guideline Harvest Level, an estimated 1.914 million pounds of halibut. *See* EA at 9. The Charter Operators' argument that the Secretary should have relied on recent participation data is in essence a claim that they are entitled to a greater allocation of the harvest because they have been harvesting a greater amount in recent years, *i.e.*, that they should be rewarded for exceeding the guidelines year after year. The Secretary understandably chose not to encourage such overharvesting.

The Charter Operators' real complaint is not that the Secretary ignored recent harvest data, but that the Secretary did not make a different allocation decision. But the Court may not substitute its own or the Charter Operators' judgment for that of the Secretary. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 ("the scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency"). Because the Secretary promulgated the Final Rule based on an evaluation of the relevant quantitative and qualitative factors and explained the basis of the Rule, establishing a rational connection between the facts found and the choice made, summary judgment will be granted in favor of the Secretary with respect to Count II.

## IV. CONCLUSION

For the reasons set forth above, Plaintiffs' motion for summary judgment [Dkt. # 17] will be denied. The Secretary's motion for summary judgment [Dkt. # 20] and the Intervenors' motions for summary judgment [Dkts. ## 19 & 22] will be granted. A memorializing Order

accompanies this Memorandum Opinion.


Date: November 23, 2009                              _____/s/_____
                                                     ROSEMARY M. COLLYER
                                                     United States District Judge